## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. SHARON K. LYON,
   Plaintiff,

   v.

1. RYAN LADD THOMPSON, and

2. THOMPSON LAW LLP,
   Defendants.

Case No. CIV-23-698-J

## MOTION TO FILE COMPLAINT UNDER SEAL

Plaintiff moves the Court to enter an Order allowing the Complaint[1] in the above styled case to be filed under seal. In support of this Motion, Plaintiff shows the Court as follows:

1.     Plaintiff retained Ryan Ladd Thompson and Thompson Law LLP to represent her in a claim against Share Convalescent Home in Alva, Oklahoma, where she lives. She signed a Fee Agreement on October 11, 2019.

2.     Unbeknownst to Plaintiff, the Fee Agreement contained a Mandatory Arbitration clause at issue in this case.

According to the Mandatory Arbitration clause:

All oral and written communications in connection with the Arbitration and Mediation, whether made by a Party, the Arbitrator, the Mediator, or JAMS, will be confidential and privileged and will not be disclosed to anyone other than the Parties, the Arbitrator, the Mediator, and JAMS; provided, a Party may file a confidential communication with a court, so long as such filing is made under seal.[2]

---

[1] Attachment 1 to this Motion.

[2] Attachment 2 to this Motion (#7 on second page).

3.      Defendants, a Texas LLP with its principal office in Texas and a lawyer admitted in Texas and Oklahoma, but who was a Texas citizen, fraudulently induced Plaintiff, an Oklahoma Citizen to not read the arbitration clause, in violation of the ethics rules of Oklahoma and Texas and did not recommend Plaintiff seek independent counsel, as required by the ethics rules of both states. As a result, Plaintiff never saw the arbitration agreement.

4.      According to the terms of the Fee Agreement signed by the Plaintiff, she requests the court allow her complaint to be filed under seal, pending a ruling by this Court on the validity of the arbitration requirement and thereafter to permit her to proceed with the case.

Wherefore, Plaintiff respectfully requests the Court to enter an Order granting the motion to file the complaint under seal.

## NATURE OF THE LAWSUIT

Plaintiff fell at a nursing home in Alva, Oklahoma on September 22, 2019. She was at the nursing home to visit her husband (a resident) who has since died. It was mealtime and the cart used to deliver meals to the residents leaked water from the steam table, which delivered food to the residents. Someone pushed the leaking cart in front of the main desk where it left a puddle, then around the corner so it was not visible.

She walked to the desk to ask a question and slipped in the water, and fell, hitting her head and injuring her leg. She has had surgery and extensive treatment from the fall.

Less than a month after the fall, her niece took Plaintiff to Dallas to visit another relative. These family members encouraged her to hire an attorney to pursue her claim

against the nursing home. Her Texas relatives found contact information for a Dallas firm, Thompson Law LLP (Thompson), which she and her niece called. She and her niece spoke with an intake person, not an attorney.

The intake person told them Thompson would gather all Plaintiff's medical records, then file the case. He told them the percentage of the recovery that would be Thompson's fee but did NOT mention an arbitration clause in the contract. The intake person also said Thompson Law had attorneys admitted in Oklahoma. Thompson sent a contract to Plaintiff by email. She signed, but did not read, the contract on October 11, 2019, using "Hellosign" on her mobile phone. Neither she nor her niece had an in-person meeting and did not speak with an attorney.

Over the next almost two years, Plaintiff or her niece had some contact with a legal assistant at the firm by a few calls and emails. This was always about medical records and they never spoke with or had contact with an attorney.

In February of 2021, Thompson sent a $150,000 demand letter to the attorneys for the nursing home but did not provide Plaintiff with a copy. She did not see this letter until her niece later obtained a copy of the entire file from Thompson. The nursing home responded by disputing the liability of the claim. Thompson did not communicate this to her or her niece.

On Friday, September 17, 2021, just 5 days before the statute of limitations ran (September 22, 2021) on the fall claim, Plaintiff's niece received a call from attorney Scott Koelker of Thompson. Mr. Koelker told her niece the nursing home had denied the claim and Thompson could not make any money, and so was dropping the case. The attorney did

NOT mention the SOL at any point in the conversation. This was the first and only attorney contact either woman had with any Thompson attorney.

On Monday, September 20, 2021, just 2 days before the September 22, 2021 SOL ran, Plaintiff received a "drop" letter[3] that was mailed via USPS to her home address The letter does not warn Plaintiff of the impending running of the SOL. It was signed by Ryan Thompson, an attorney with Thompson Law, LLP.

Plaintiff is a 79-year-old widow who will turn 80 years-old in December. She finished high school and attended a year of college but dropped out to get married. Her only income is her monthly Social Security payment of $1,998.00. All of her living expenses, totaling approximately $2,051.89 per month must be paid out of the Social Security pension. Even without the cost of arbitration, Plaintiff is unable to afford all the medications prescribed by her doctors. Because of her financial situation, Plaintiff is not able to bear the cost of arbitration. Also, Plaintiff is not able to make a trip to Dallas by herself for an out-of-state arbitration as is demanded in the Thompson contract's arbitration provision.[4]

## ARGUMENT AND AUTHORITIES

## PROPOSITION I: THE PROPOSED ARBITRATION PROVISION IS FACIALLY UNCONSCIONABLE AND CANNOT BE THE BASIS FOR BINDIING ARBITRATION

We are confronted at the outset with clear Federal Law that the Lawyer's proposed arbitration clause is facially void and cannot be the basis of a decision by an arbitrator

---

[3] Attachment 3 to this Motion.
[4] Attachment 4 to this Motion.

chosen pursuant to the Lawyer's Dispute Resolution Clause. As a result, the arbitrators' fee provision is, on its face, unconscionable.

The "Dispute Resolution Clause"[5] provides: The arbitrator's fee shall be equally divided between the parties." The cases call this the arbitration clause costs division.

In *Shankle v. B-G Maint. Mgmt. of Colorado, Inc.*[6] the 10th Circuit holds that when a proposed arbitration provision requires the financially weaker of the two parties to the contract to pay half of the arbitrator's fees, which the weaker party is unable to pay, the arbitration clause is void. The employer fired Shankle, for which Shankle sued under the ADA and ADEA.

The employer there, like the attorney here, sued to assert an arbitration clause in its employment contract. There, as here, Shankle claimed he was unable to afford to pay half of the arbitrator's fees, as provided in the arbitration clauses of both the contracts in his case and our case. The District Court denied defendant arbitration under the 50% split provision of the proposed arbitration clause. The 10th Circuit affirmed, citing *Cole v. Burns Int'l Sec. Servs.*[7]

More recently, the 10th Circuit has followed *Shankle* in denying arbitration to a school in a Fair Labor Standards violation case in *Nesbitt v. FCNH, Inc.*[8] where another school was sued for not paying students for work they did and for which the school got

---

[5] *Supra*, footnote 2.
[6] 163 F.3d 1230, 1234-35 (10th Cir. 1999).
[7] 105 F.3d 1465, 1468 (10th Cir. 1997).
[8] 811 F.3d 371, 380 (10th Cir. 2016).

paid. The problem was again that the students would have to have borne the expenses of arbitration and could not afford it.

Arbitration cost splitting cases like *Shankle* have come down, in addition to the DC Circuit and the 10th Circuit in several circuits. The Third Circuit in *Blair v. Scott Specialty Gases*[9] adopted a ruling from the DC Circuit that there must be a finding of the ability of a plaintiff (there an employee) to pay arbitration cost. *Morrison v. Cir. City Stores, Inc.*[10] adopts a "case-by-case" approach as to arbitrations' s fee split case saying:

> If, then, the splitting or sharing of the costs of the arbitral forum under a particular arbitration agreement effectively prevents the vindication of a plaintiff's statutory rights, those rights cannot be subject to mandatory arbitration under that agreement.

The 9th Circuit concurs with the 10th Circuit: *Ingle v. Cir. City Stores, Inc.*,[11] *Ting v. AT&T*,[12] *Martin v. TeleTech Holdings, Inc.*,[13] and *Cir. City Stores, Inc. v. Adams*[14] hold a fee-splitting arbitration payment provision unconscionable and, unenforceable. *Blair v. Scott Specialty Gases*[15] brings the 3rd Circuit into the holding. Blair suffered for years from sexual harassment by a supervisor:

> Blair alleges that during her initial interview with one of the Vice–Presidents of Scott, Tom Barford, he told her he would "rather employ a male plant manager, with a couple of kids who lived nearby and wouldn't leave him high and dry in a few months to marry a lawyer or doctor." . . . Blair further alleges that Barford told her that he could not attend the sensitivity training on sexual discrimination and harassment "because he was a 'sexist pig' and

---

[9] *283 F.3d 595* (3d Cir. 2002).
[10] 317 F.3d 646 (6th Cir. 2003).
[11] 328 F.3d 1165, 1177-8 (9th Cir. 2003).
[12] 319 F.3d 1126, 1151 (9th Cir. 2003).
[13] 213 F. App'x 581 (9th Cir. 2006).
[14] 279 F.3d 889, 895 (9th Cir. 2002).
[15] 283 F.3d 595, 604-5 (3rd Cir. 2002).

that if people knew all the things he had done, he would be fired." . . . In fact, Blair alleges that after she was hired, Barford demeaned her suggestions during meetings, as well as those of other female staff members, and routinely made sexist references to her, such as "putting tits on a bull" and "putting people in bed together." . . . He allegedly commented on her appearance and choice of clothing, and suggested, for example, that she wear skirts more often to show her legs.[16]

The trial judge first dismissed the Complaint with prejudice, but on motion to reconsider, modified the Order to dismiss without prejudice and ordered the parties to arbitrate their claims. Blair appealed, claiming she could not afford the arbitration fees. The 3rd Circuit reversed.[17]

All these cases indicate one thing: the arbitration provision the attorney proposes to use won't work. The Courts in which these issues arise certainly need to use their experience in determining whether the economic model proposed by the attorney works. It is quite one thing to have an arbitration between two companies of more-or-less equal ability to pay arbitration costs and the case of a lawyer and an elderly widow of modest means. This Court should hold a hearing to determine whether Plaintiff can afford to pay half the arbitration fee. If she can't, the arbitration clause cannot be applied.

### PROPOSITION II: THE ETHICS RULES OF BOTH THE TEXAS AND OKLAHOMA BARS REQUIRE LAWYERS TO DIRECT THE CLIENTS' ATTENTION TO AND ADVISE CLIENTS TO SEEK INDEPENDENT COUNSEL'S ADVICE BEFORE INCLUDING BINDING ARBITRATION IN A CLIENT CONTRACT; THE DEFENDANTS DID NOT FOLLOW THESE RULES

Both Bar Associations have ethical rules forbidding a lawyer using a prospective binding arbitration provision to limit the lawyer's liability for malpractice. A Texas lawyer,

---

[16] *Ibid.* at 597-8 9 (Citations omitted).
[17] *Ibid.* at 611-12.

is trying to use arbitration to represent a client in Oklahoma and protect the lawyer against

liability. Oklahoma's rule is direct:

> C. Scope of the Arbitration Clause. . .'
>
> 3. Malpractice Disputes. An attorney may not include an arbitration clause in an attorney-client contract that limits an attorney's liability for malpractice. Rule 1.8(h) provides in pertinent part that "[a] lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for the lawyer's personal malpractice. . . "[18]

The Texas ethics rule is less direct and clear but its effect here is the same:

> The Texas Disciplinary Rules of Professional Conduct do not specifically address agreements for arbitration of malpractice claims. The Texas Disciplinary Rules prohibit a lawyer from prospectively agreeing with a client to limit the lawyer's malpractice liability unless the agreement is permitted by law <u>and the client is represented by independent counsel with respect to the agreement.</u> Rule 1.08(g). Most state bar ethics committees that have considered the issue, as well as the American Bar Association Standing Committee on Ethics and Professional Responsibility in ABA Opinion 02-425, have concluded that binding arbitration provisions do not prospectively limit a lawyer's liability but instead establish a procedure for resolving such claims. See ABA Opinion 02-425 at footnote 8. ABA Opinion 02-425 concluded:
>
> "It is ethically permissible to include in a retainer agreement with a client a provision that requires the binding arbitration of fee disputes and malpractice claims provided that (1) *the client has been fully apprised of the advantages and disadvantages of arbitration and has been given sufficient information to permit her to make an informed decision about whether to agree to the inclusion of the arbitration provision in the retainer agreement*, and (2) <u>the arbitration provision does not insulate the lawyer from liability or limit the liability to which she would otherwise be exposed under common and/or statutory law.</u>"[19]

---

[18] Oklahoma Bar Association Ethics Opinion No. 312, Adopted August 18, 2000, Attachment 5 to this Brief.

[19] Texas Bar Association Ethics Opinion No. 586, Adopted October, 2008, Attachment 6 to this Brief. (Emphasis added.)

The Oklahoma Rule forbids outright the use of an arbitration agreement to limit the lawyer's malpractice liability and the Texas rule permits use of an arbitration rule to limit the lawyer's liability only to the extent the client was given full advice to enable her to make an informed decision <u>and</u> the arbitration decision does not purport to insulate the lawyer from liability. The Texas rule would not be satisfied on either count.

## PROPOSITION III: *ERIE RAILROAD V. TOMPKINS* REQUIRES THE FEDERAL COURT TO FOLLOW THE OKLAHOMA LAW

This is a diversity of citizenship cas*e. Erie Railroad v. Tompkins*[20] requires the federal court to follow the law of the state in which the Court sits. *Scottsdale Ins. Co. v. Tolliver*[21] That is Oklahoma law.

## CONCLUSION

This Court should allow the filing of this Complaint under seal and set a hearing after the Defendants have time to respond and let the case proceed not under seal.

Respectfully submitted,

s/ Rex Travis
REX TRAVIS, OBA #9081
Travis Law Office
12220 N. MacArthur Blvd., Suite F #220
Oklahoma City, OK 73162-1851
info@travislawoffice.com
Telephone: (405) 236-5400
Attorney for Plaintiff

---

[20] 304 U.S. 64, 77, 58 S.Ct. 817, 822.
[21] 636 F.3d 1273,1276-8 (10th Cir. 2011).

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of August, 2023, I electronically transmitted the foregoing document to the Clerk of Court via email for filing under seal. I also mailed via USPS a copy of the foregoing document, its attachments, and the Complaint in this matter to:

Mr. Ryan Ladd Thompson
Thompson Law LLP
3300 Oak Lawn Ave.
Third Floor
Dallas, TX 75219

s/ Rex Travis
_____

**Attachment 1 - Complaint**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.  SHARON K. LYON,<br>        Plaintiff,<br><br>v.<br><br>1.  RYAN LADD THOMPSON, and<br><br>2.  THOMPSON LAW LLP,<br>        Defendants. | Case No. |

## <u>COMPLAINT</u>

Plaintiff Sharon K. Lyon, for Complaint against Defendants Ryan Ladd Thompson and Thompson Law, LLP, ("Thompson") states:

(1)   Plaintiff is a citizen of Oklahoma.

(2)   Defendant Ryan Ladd Thompson is a Texas citizen; Thompson Law, LLP, is a Texas limited liability partnership with its principal place of business in Texas.

(3)   This Court has specific personal jurisdiction by reason of Defendants' representation of Plaintiff in a legal dispute for a claim arising in Alva, Oklahoma. Defendants have sufficient minimum contacts with this State and sufficiently avail themselves to the market of this State through their marketing and Ryan Ladd Thompson's admittance to practice in Oklahoma courts and having agreed to do so.

(4)   On September 22, 2019, Plaintiff was visiting her husband, a patient at Share Convalescent Home ("Share") in Alva, Oklahoma, who has since died, when she slipped on water which had leaked from the steam table on a meal cart. She slipped,

fell and struck her head on a nearby wall. An employee of the nursing home had pushed the meal cart around the corner from its location, leaving a puddle of water on the floor with no warning sign.

(5)   Plaintiff and her niece hired Thompson to represent her in a claim against Share. She signed a Fee Agreement on October 11, 2019.

(6)   Thompson obtained Plaintiff's medical records and submitted a demand to counsel for Share, but did not file a lawsuit. Apart from occasional messages about medical bills and records, Plaintiff had little to no communication with anyone from Thompson Law.

(7)   The first time Plaintiff or someone on her behalf spoke to an attorney with Thompson was on or about September 17, 2021when Plaintiff's niece received a call from Scott Koelker. He informed Plaintiff's niece he was terminating the representation and would no longer pursue her claim because it could make little or no money from the claim.

(8)   On or about September 20, 2021, Plaintiff received a letter from Thompson informing her the firm was terminating its representation, and would no longer pursue her claim. The letter was dated September 15, 2021.

(9)   At no time did anyone from Thompson inform Plaintiff or her niece the statute of limitations on her claim expired two years from the date of the incident, or September 22, 2021.

2

(10) Because of Defendant's failure to inform or warn Plaintiff of the impending deadline, she was unaware a lawsuit had to be filed to continue to pursue her claim.

(11) Plaintiff first contacted Travis Law Office September 23, 2021, the day after the statute of limitations on her claim against Share expired.

(12) Due to the malpractice of Thompson Law, LLP, plaintiff has and will incur financial distress and bills; suffered and will suffer emotional pain and has lost her claim clam against the nursing home, which had a value in excess of $150,000.00.

**WHEREFORE**, Plaintiff prays judgment against Thompson and the firm in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code, interest, costs, attorney's fee, and all other appropriate relief.

s/ Rex Travis
REX TRAVIS, OBA #9081
info@travislawoffice.com
12220 N. MacArthur Blvd., Suite F #220
Oklahoma City, OK 73162-1851
Telephone: (405) 236-5400
Attorney for Plaintiff

**ATTORNEYS LIEN CLAIMED**
**JURY TRIAL DEMANDED**

**THOMPSON LAW LLP CLIENT FEE AGREEMENT**
**(this "Agreement")**

The undersigned **Sharon Lyon** _____ ("Client"), hereby employs Thompson Law LLP, ( "Firm") as my attorneys to make claims and file suit, if deemed necessary, to collect all damages and compensation, and obtain all appropriate relief to which Client may be entitled, as well as to, with consent, compromise and settle all claims held by Client arising out of or resulting from an incident that occurred on or about **9/22/2019** ("Incident").

1. **THE FIRM'S AUTHORITY.** Client fully authorizes and directs the Firm to manage and handle my claims as they deem proper and to investigate and prosecute them, with or without filing a lawsuit, in any manner they deem advisable. Client authorizes the Firm to deliver in my name any and all notices, receipts, authorizations, releases, pleadings and any other documents proper in and to the handling of my claims. Client authorizes the Firm to use their professional judgment and any relevant documents, records, or other information the Firm deems necessary to the proper representation of Client. If, at any time, the Firm determines, for any permissible reason, the prosecution of Client's claims should be discontinued, the Firm may withdraw from my representation. Client understands and agrees the Firm may transmit Client's protected health information electronically in the course of representing Client. Client fully consents that the Firm may, in the exercise of its professional judgment, choose to employ or associate one or more additional attorneys to prosecute the claims. The parties agree that this Agreement may be electronically signed, and that the electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability and admissibility. Client consents to all other forms of electronic communication with the Firm, including text and email messages both during and after representation. This Agreement shall be binding upon the parties hereto, their respective heirs, assigns, successors, administrators, representatives, and executors.

2. **CLIENT'S COOPERATION.** Client agrees to cooperate fully with the Firm, disclose all relevant facts and promptly advise the Firm of any change in address or telephone number, and to promptly comply with all reasonable requests of the Firm on all matters related to this Agreement. Client understands that failure to fully and promptly cooperate may be a basis for termination of this Agreement. Client agrees not to attempt on their part to unilaterally settle the claims made the subject of this Agreement. The Client will rely exclusively upon the representation of the Firm during any settlement negotiations. No settlement will be made without the Client's consent, except in the event a reasonable offer has been received on Client's case within two months of the statute of limitations, and the Firm is unable to reach me, I give the Firm full authority to settle my case. I understand the Firm will deposit the settlement proceeds in the Firm's bank account and will hold my portion in said account until claimed by me.

3. **CONTINGENT FEE.** The Firm assumes sole responsibility for Client's representation. In consideration of such legal services, Client hereby assigns and grants to the Firm the following percentage of any monies, interest, or property recovered, depending on when a recovery is made: **THIRTY FIVE PERCENT (35%)** in the event a recovery is made prior to filing suit; or **FORTY PERCENT (40%)** in the event a recovery is made after suit is filed. For purposes of calculating the Firm's fee, the recovery will include, but is not limited to, monies recovered from liability policies, uninsured / underinsured motorist coverage, MedPay, personal injury protection coverage, and all other insurance. Recovery for property damage is not subject to fees unless otherwise agreed. **Attorneys' fees will be determined before repayment of expenses;** that is, attorneys' fees will be calculated based on the gross recovery, before expenses are deducted. **In the event there is no recovery, Client owes the Firm nothing**. Client grants the Firm a lien and assignment on Client's claims, and further grants the Firm a lien and assignment against any monies, interest, or property paid by anyone for any reason to settle or otherwise resolve any claims arising from or related to the Incident, without regard to whether liability is admitted or denied, in the amounts set forth herein. Client represents they do not currently employ another attorney in this matter and have not assigned any part of the claims to any other party. If Client chooses to terminate this Agreement by obtaining another attorney or to handle the case themselves, the Firm will return Client's file, and the parties agree the Firm shall retain its full contractual fee interest pursuant to this Agreement without regard to the duration of representation.

4. **EXPENSES PAID BY THE FIRM.** The Firm agrees to advance any and all reasonable expenses associated with the prosecution of client's claim. Expenses advanced by the Firm will be repaid to it from any recoveries made. **In the event no recovery is made, no repayment of expenses advanced will be required**. Advanced expenses that shall be reimbursed include any expenses related to the representation other than general overhead expenses; for example, reimbursable expenses include, but are not limited to, document copying and scanning performed by others; photograph, video, and graphics expenses and reproduction thereof; mileage at the rate allowed by the IRS; travel, and related meals, lodging and airfare; healthcare provider or treatment related expenses; medical equipment; records; legal research; UPS/FedEx charges, and investigation charges. The reimbursable expenses will also include any and all expenses or costs paid to or for persons, entities or businesses outside the firm which are related to the representation, including but not limited to, experts and their staffs; jury consultants; specialized legal counsel for bankruptcy or probate proceedings; Medicare/Medicaid, hospital lien, and subrogation resolution services; interpreters; investigators; court reporters; videographers; and record retrieval services. Regardless of outcome, Client will be responsible for all medical bills and liens incurred as a result of medical treatment received. Internal copying, printing, scanning, long distance charges, along with all USPS postage and related expenses, shall be expensed by the Firm to Client at a flat rate of $100 for each recovery or settlement made prior to filing suit, or $200 for each recover or settlement in the event a recovery is made after suit is filed, without regard to costs incurred. Client understands the Firm may be representing multiple clients and agrees that in representing multiple clients many of the expenses incurred are common case expenses, which are costs and expenses incurred for the benefit of multiple clients, including expert witness fees, depositions of defendants, experts, and non-party witnesses, settlement conferences, trial expenses, filing fees, and other expenses that are incurred for purposes of influencing the outcome of multiple clients' claims. Client agrees the expenses Client is required to reimburse, if there is a recovery, include not only expenses for their claims, but also common case expenses.

5. **MULTIPLE CLIENTS AND CONFLICT OF INTEREST.** Client understands and agrees the Firm may represent more than one client in this matter and the following aspects of joint representation have been disclosed: (1) Client might gain or lose some

1

advantages if represented by separate counsel; (2) the Firm cannot serve as an advocate for one client against another client, but must assist all clients in pursuing their common purposes; (3) the Firm must deal impartially with every client; (4) information received by the Firm from or on behalf of any jointly represented client concerning the matter may not be confidential or privileged as between the jointly-represented clients and may be disclosed to other jointly-represented clients as deemed proper or necessary; (5) if a conflict arises between clients that results in the discharge or withdrawal of the Firm, the Firm might not be able to continue representing any of the clients involved; and (6) the representation of all clients by the Firm will not necessarily expedite handling of the claims or reduce associated fees and expenses. **Client consents to the Firm representing more than one client in this matter.**

6.    **AUTHORITY TO SIGN DOCUMENTS.** Client authorizes the Firm to sign for Client and in Client's name: powers of attorney, authorizations, HIPAA forms, HITECH directives, letters of protection, discovery responses, pleadings and or documents filed with the court, checks, drafts, endorsements and all other documents the Firm deems necessary to further Client's claims. The Firm is further authorized to endorse Client's name to all checks and drafts or other instruments necessary to pay or settle said claims, and to execute for, and on behalf of Client, any and all receipts, releases, and discharges necessary to effect settlement. The Firm is vested with full right to collect and to pay all attorney's fees, monies, and other expenses then owing and incurred by Client, including but not limited to, physicians, treaters, imaging centers, hospitals and all other expenses described herein. The Client agrees after giving the Firm verbal authority to settle their claim, they will execute a release of the defendant(s) and their insurers before a disbursement sheet will be prepared, before any medical reductions are finalized, and before any hospital liens and letters of protection are satisfied. The settlement check will then be ordered from the insurance company.

7.    **MANDATORY ARBITRATION. Any dispute between any combination of the signatories to this Agreement or any of their agents, heirs, successors, or representatives (each, a "Party"), large or small, at law or in equity, arising out of or in any way, shape, or form relating to or arising from this Agreement, including, without limitation, the determination of whether this provision is applicable to a dispute, will be determined by a binding, mandatory arbitration administered by one arbitrator** (the "Arbitration" and the "Arbitrator," respectively)**; provided, that any Party may file an action in any court of competent jurisdiction to enforce this ADR provision; and, if any Party to a dispute fails to submit to Arbitration following the filing, then the Party failing to submit to Arbitration will bear the other Party's reasonable costs, including attorneys' fees, paid in connection with compelling Arbitration**. The Arbitrator will be the Hon. Glen M. Ashworth (Ret.) unless he is unwilling or unable to serve. If he is unwilling or unable to serve, then the Arbitrator will be the Hon. Mark Whittington (Ret.), unless he is unwilling or unable to serve. If he is unwilling or unable to serve, then the Arbitrator will be selected from among the arbitrators then based in JAMS' Dallas office, and the Arbitrator will be selected pursuant to JAMS Streamlined Arbitration Rules & Procedures (the "Rules"). The Arbitrator will conduct the Arbitration pursuant to the Rules; provided, if this ADR provision includes a term in conflict with the Rules, then the term(s) set forth in this ADR provision will control in all circumstances. Upon appointment of the Arbitrator, and in parallel with the Arbitration, the Parties will mediate (the "Mediation"). The Mediation will be led by a person designated by the Arbitrator, in his/her sole discretion (the "Mediator"). The Mediator will administer a mediation within 20 business days of his/her appointment and, again, within 20 business days before the date on which the Arbitration hearing will begin. The Arbitrator will begin the Arbitration hearing within 60 business days after the date of his/her appointment, end the hearing within 5 consecutive business days after the date the hearing begins, and issue his/her Award within 10 business days after the hearing ends. All oral and written communications in connection with the Arbitration and Mediation, whether made by a Party, the Arbitrator, the Mediator, or JAMS, will be confidential and privileged and will not be disclosed to anyone other than the Parties, the Arbitrator, the Mediator, and JAMS; provided, a Party may file a confidential communication with a court, so long as such filing is made under seal. If one or more Parties file two or more demands for Arbitration arising out of or in connection with the same Incident (each a "Related Demand"), then the Arbitrator selected in connection with the first of the Related Demands will consolidate all Related Demands before him/her. No Party or Arbitrator may (a) consolidate a dispute arising out of this Agreement (or the same Incident) with a dispute arising out of another agreement or distinct incident or (b) arbitrate a dispute on a class-wide or representative basis. Judgment on the Arbitrator's award (the "Award") may be entered in any court of competent jurisdiction. The Arbitration and all related proceedings, including, without limitation, discovery (e.g., depositions), and mediations will occur exclusively in Dallas, Texas; and, the Rules will govern the Arbitration. The Award will be binding and not subject to appeal, absent breach of this provision; and then, only to the extent of the breach. The Parties will indemnify the Arbitrator for each and all of the Arbitrator's acts and omissions in connection with the Arbitration. This agreement involves interstate commerce, and this ADR provision will be governed, first, by its terms, second, by the Federal Arbitration Act (Title 9 of the US Code), and, third, by Texas law. The Parties will pay their respective costs in connection with the Arbitration and Mediation, and each side will pay an equal share of the costs payable to the Arbitrator and the Mediator. Statutes of limitations and repose applicable to any dispute will apply to any Arbitration in connection with the dispute. Notwithstanding any other term or condition in this Agreement, this ADR provision will survive termination of this Agreement. Some considerations to determine if a party would like to engage in arbitration are (a) the cost and time savings frequently found in arbitration, (b) the waiver of significant rights, such as the right to a jury trial, (c) the possible reduced level of discovery, (d) the relaxed application of the rules of evidence, and (e) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds.

8.    **RESULTS NOT CERTAIN.** The recovery amount ultimately obtained is not guaranteed, and while the Client and the Firm may discuss a potential recovery range, Client understands that any estimate is to allow Client to evaluate his/her claim and is not a promise or guarantee. The Firm will not be responsible for any medical bills, liens, medical care, treatment, medical equipment, or management. Settlements will be inclusive of all expenses, damages, and medical / treatment related costs incurred.

9.    **ATTORNEY AND STAFF HANDLING CASE.** Client understands and authorizes the Firm to assign, as determined by the Firm, an attorney and or staff to handle this matter for Client without further consultation with Client. The Firm does not promise or represent any particular person (including Mr. Thompson) will handle the matter for Client. The Firm retains the right to assign or reassign any attorney or staff member to the matter, or away from the matter, in the Firm's sole discretion.



2

**10.** **CLIENT CASE RECORDS.** Five years from the date of this Agreement, your records will be disposed of in accordance with the Firm's privacy policy. If needed, you must request a copy of your records in writing prior to this time.

**11.** **CLIENT REVIEWS AND DISCLOSURE OF PRIVILEGED INFORMATION.** The Texas Disciplinary Rules of Professional Conduct require that, with certain exceptions, the lawyers and staff of the Firm not disclose Client's confidential information, which includes information protected by the lawyer-client privilege, information furnished to the Firm by Client, or information acquired by the Firm during the course of or by reason of its representation of Client. The Firm has procedures in place to maintain such confidentiality at all times while representing Client; however, the Firm reserves the right, and Client hereby agrees, if the Client posts an online review or comment about the Firm, the Firm may disclose Client's confidential information as the Firm deems reasonably necessary to correct a misstatement or otherwise fairly respond to Client's online review or comment. The Firm's online response may include information Client would otherwise not want disclosed, including confidential information.

**12.** **NO SOLICITATION OF CLIENT.** Client understands Client may select any attorney of Client's choice, and by signing this Agreement, Client has willingly and freely chosen the Firm to represent client. By signing and entering into this Agreement, Client hereby affirms Client's case was not solicited by the Firm, this Agreement is not being entered into as a result of promises of money, no promises of a successful recovery have been made to Client, the terms herein are fair, and Client voluntarily makes this Agreement after sufficient review and opportunity to ask questions, and seek advice from other counsel, if desired.

**13.** **SOLE AGREEMENT, SEVERABILITY AND ENFORCEMENT.** This Agreement represents the sole and only agreement of the parties and supersedes any prior understandings (written or oral) between the parties or their predecessors respecting the subject matter. The scope of the Firm's duties and responsibilities shall not be expanded in any way unless specifically set forth in writing between the parties. This Agreement may be amended only by written agreement signed by both parties. This Agreement is effective upon execution by the Client and the Firm. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, the legality, validity, and enforceability of the remaining provisions of this Agreement will not be affected. This Agreement will be construed without regard to any rule requiring construction or interpretation against the party drafting same. If any party perceives another may be in default in connection with this Agreement, such party will provide such other party notice of, and a reasonable opportunity to cure, such default; if the latter timely cures such default, or if the former provides the latter notice of the former's intent to waive such default, then there will have been no default under this Agreement. To the extent this Agreement requires a party consent to, or give notice of, anything, such consent or notice must be in writing, signed by such party, and a copy must be delivered to all other parties. Finally, Client confirms Client had sufficient time and opportunity to fully review and understand this Agreement prior to signing, including the time and opportunity to have this Agreement reviewed by other counsel, if desired, and moreover, Client confirms they have received a copy of this Agreement. Client and the Firm thus enter into this Agreement freely, without duress, and after due consideration.

10 / 11 / 2019

EXECUTED on this date: _____.

**READ AND ACCEPTED BY:**                                          **APPROVED AND ACCEPTED:**

_____                                _____

**CLIENT SIGNATURE**                                              **FOR THOMPSON LAW LLP**

**CLIENT'S CONTACT INFORMATION:**

First: sharon _____ Middle Kay _____ Last Lyon _____ Suffix: _____

Home Phone: 5803273487 _____ Cell Phone: 5808291769 _____ Email: skdl1ok@yahoo.com _____

Doc ID: 0d66139850b03649fb519701f62937e87617e47d

# ▼ **HELLOSIGN**

# Audit Trail

| | |
|---|---|
| **TITLE** | Thompson Law - Client Agreement - 1-800-LION-LAW |
| **FILE NAME** | Thompson Law Agreement 112018.pdf |
| **DOCUMENT ID** | 0d66139850b03649fb519701f62937e87617e47d |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ○<br>SENT | **10 / 10 / 2019**<br>16:56:19 UTC-6 | Sent for signature to Sharon Lyon (cyndi1@travisscale.com)<br>and Ryan Thompson (thompsonlaw@triallawyers.com) from<br>dguzman@triallawyers.com<br>IP: 206.198.133.86 |
| ◎<br>VIEWED | **10 / 10 / 2019**<br>16:57:35 UTC-6 | Viewed by Sharon Lyon (cyndi1@travisscale.com)<br>IP: 174.236.9.39 |
| ⤶<br>SIGNED | **10 / 11 / 2019**<br>14:15:19 UTC-6 | Signed by Sharon Lyon (cyndi1@travisscale.com)<br>IP: 174.236.9.39 |
| ◎<br>VIEWED | **10 / 11 / 2019**<br>14:17:07 UTC-6 | Viewed by Ryan Thompson (thompsonlaw@triallawyers.com)<br>IP: 206.198.133.86 |
| ⤶<br>SIGNED | **10 / 11 / 2019**<br>14:17:17 UTC-6 | Signed by Ryan Thompson (thompsonlaw@triallawyers.com)<br>IP: 206.198.133.86 |
| ✓<br>COMPLETED | **10 / 11 / 2019**<br>14:17:17 UTC-6 | The document has been completed. |



THOMPSON LAW LLP
Attorneys at Law

3300 Oak Lawn Ave., 3rd Floor
Dallas, Texas 75219
214.755.7777 PHONE
214.716.0116 FAX
www.TrialLawyers.com

September 15, 2021

Sharon Lyon
124 Aspen Drive
Alva, OK 73717

**Re: Your Personal Injury Case on or about September 22, 2019**

Dear Sharon Lyon,

After careful consideration of the circumstances surrounding your case, and as our office discussed with your representatives today, we regretfully must decline to represent you in this matter. This is not a reflection on the merits of any causes of actions you may have; however, we will not be taking any further action in the case.

We wish you the very best. Thank you for the opportunity to work on the matter with you.

**Sincerely,**

**Ryan L. Thompson**
Attorney at Law
Thompson Law
RLT/sk

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

1.  SHARON K. LYON,
    Plaintiff,

v.

Case No.

1.  RYAN LADD THOMPSON, and

2.  THOMPSON LAW LLP,
    Defendants.

## ATTACHMENT 4 TO PLAINTIFF'S MOTION TO FILE UNDER SEAL: PLAINTIFF'S AFFIDAVIT

I, Sharon K. Lyon, being of age and sound mind, state as follows:

I fell at a nursing home in Alva, Oklahoma on September 22, 2019. I was at the nursing home to visit a resident, my late husband, but was not a resident. It was mealtime and the cart used to deliver meals to the residents leaked. Someone pushed the leaking cart in front of the main desk where it left a puddle, then around the corner so it was not visible. I walked to the desk to ask a question and slipped in the water, did the "splits" injuring my leg, then hit my head on the wall. I have had over 40 physical therapy visits, several MRIs, a recent surgery on my foot, and other treatment for my injury from the fall. I still have trouble with my legs, making walking difficult, and need additional treatment.

A little less than a month after my fall, my niece, Cyndi Travis, and I went to Dallas to visit another relative. I had severe bruising and was not doing well after the fall. My family encouraged me to hire an attorney to pursue my claim against the nursing home. My Texas relative found contact info for a Dallas firm, Thompson Law, which I called along with my niece. My niece and I spoke with an intake person, not an attorney. The

intake person told us Thompson Law would gather all my medical records then file the case. He told us the percentage of the recovery that would be Thompson Law's fee, but did NOT mention the arbitration clause in the contract. The intake person also said Thompson Law had attorneys admitted in Oklahoma. After the phone call, Thompson Law sent a contract to me via email. I signed the contract on October 11, 2019, using Hellosign on my mobile phone. I did not have an in-person meeting, and my niece and I did not speak with an attorney.

Over the next almost two years, my niece and I had some contact with a legal assistant at the firm via a few calls and emails. This was always about medical records and I never spoke with or had contact with an attorney.

In February of 2021, Thompson Law sent a $150,000.00 demand letter to the attorneys for the nursing home, but did not provide me with a copy. I did not see this letter until my niece obtained a copy of my entire file from Thompson Law. The nursing home responded by disputing the liability of my claim. Thompson Law did not communicate this to me or my niece.

On Friday, September 17, 2021, just 5 days before the statute of limitations (SOL) ran on my fall claim, my niece received a call from attorney Scott Koelker of Thompson Law. Mr. Koelker told my niece the nursing home had denied the claim and Thompson Law could not make any money, so was dropping my case. The attorney did NOT mention the SOL at any point in the conversation. This was the first and only attorney contact either my niece or I had with any Thompson Law attorney.

2

On Monday, September 20, 2021, just 2 days before the September 22, 2021 SOL ran, I received a "drop" letter that was mailed via USPS to my home address. The letter does not warn me of the impending running of the SOL. It is signed by Ryan Thompson, an attorney with Thompson Law, LLP.

I am a 79-year-old widow. I will turn 80 years old in December. I have a high school diploma. I attended a year of college but dropped out to get married. My only income is my monthly Social Security payment of $1,998.00. All of my living expenses, totaling approximately $2,051.89 per month must be paid out of my Social Security. Even without the cost of arbitration, I am not able to afford all the medication I have been prescribed. Because of my financial situation, I am not able to bear the cost of arbitration.

Also, I am not able to make a trip to Dallas by myself for out-of-state arbitration as is demanded in the Thompson Law contract's arbitration provision.

The above statement is true and correct.

7/20/23
Date

Sharon K. Lyon

SUBRSCIBED and sworn to before me this 20 day of July, 2023.

NOTARY PUBLIC

My Commission Expires:
04· 14· 2026

Commission # 22005255

KIMBERLY ANN SCHMIDT
Notary Public-State of Oklahoma
Woods County
Commission Number 22005255
Commission Expires 04·14·26

3

**Attachment 5 - Ethics Opinion No. 312 - Oklahoma Bar Association**



(https://www.okbar.org/)

Home (https://www.okbar.org/) | Members (https://www.okbar.org/members/) | Resources (https://www.okbar.org/public/) | About (https://www.okbar.org/about/)

Search

(https://ams.okbar.org/eweb/DynamicPage.aspx?
WebCode=LoginRequired&expires=yes&Site=ok

 (https://ams.okbar.org/eweb/DynamicPage.aspx?
WebCode=LoginRequired&expires=yes&Site=okbar2020)

(https://ams.okbar.org/eweb/DynamicPage.aspx?
WebCode=LoginRequired&expires=yes&Site=ok

Login (https://ams.okbar.org/eweb/DynamicPage
WebCode=LoginRequired&expires=yes&Site=ok

# Ethics Counsel

≡

## Ethics Opinion No. 312

Adopted August 18, 2000

TOPIC

Use of Mandatory Arbitration Clauses in Attorney-Client Contracts.

INQUIRY

Lawyer "A" provides a retainer agreement to his client containing a clause that all disputes "arising under the retainer agreement" shall be subject to binding arbitration.

ABSTRACT

This inquiry raises the question whether a lawyer may permissibly include in a retainer agreement a provision mandating that all disputes arising under the agreement be subject to binding arbitration. We assume that the purpose and intended effect of such a provision would be to compel arbitration of not only fee disputes but also claims of breach of contract, legal malpractice and/or other torts arising from the attorney/client relationship under the agreement. In our opinion, subject to the caveats below and definitive resolution by the Oklahoma Supreme Court of the issue of whether arbitration clauses in an attorney fee agreement are valid under Oklahoma substantive law, nothing in the Rules of Professional Conduct prohibits such an arbitration clause; however, attorneys, after full disclosure, must ensure that they have their client's informed consent to the mandatory arbitration clause if it was not requested by the client. Further, the attorney and the client cannot agree that any disciplinary complaints or disciplinary proceedings against the attorney will be handled by private arbitration.

The primary function of the Legal Ethics Committee ("the Committee" or the "LEC") of the Oklahoma Bar Association is to consider inquiries for members of the OBA involving legal ethics and to respond in accordance with the Committee's rules. When warranted, the LEC will prepare advisory opinions for approval and issuance by the OBA's Board of Governors. Advisory opinions reflect the application of the Rules of Professional Conduct and any applicable authority known to the LEC, to specific legal issues. The LEC makes every attempt to conduct thorough research in preparation of an advisory opinion. Nevertheless, members should conduct their own research regarding specific ethical issues.

Legal Ethics involve the professional responsibilities and obligations of lawyers. The opinion that follows is intended as a guide to responsible professional behavior. It is not presented as a sole route to legal virtue. Advisory opinions shall only have such force and effect as they are given by the Supreme Court of the State of Oklahoma and shall not be construed as anything other than advisory in nature. The OBA disclaims any liability in connection with the issuance of any of its opinions.

ANALYSIS

A. Enforceability of Arbitration Clauses; Applicability of Uniform Arbitration Act.

Except for collective bargaining agreements and contracts with reference to insurance, Oklahoma's Uniform Arbitration Act, 15 O.S. 1991 § 801 *et seq.*, allows parties to enter into a written agreement to arbitrate disputes. Section 802(A) of the Act recognizes that "[s]uch agreements are valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of any contract." (FN1 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#1))

The Oklahoma Supreme Court has upheld the enforceability of voluntary agreements to submit future disputes to arbitration pursuant to the Oklahoma Arbitration Act, finding that "a strong public policy favors arbitration in Oklahoma," *Rollings v. Thermodyne Industries, Inc.,* 1996 OK 6, 910 P.2d 1030; *Shaffer v. Jeffery,* 1996 OK 47, 915 P.2d 910, 917. However, under the Oklahoma Act, any allegations of fraud in the inducement of the arbitration clause itself or the underlying contract of which the arbitration agreement is a part must be adjudicated by a district court, rather than decided in arbitration. *Shaffer v. Jeffrey,* 915 P.2d at 917,(FN2 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#2))

The arbitration clause at issue in *Shaffer v. Jeffrey* was contained in an attorney/client contract. However, because the sole question before the Court was whether the district court had jurisdiction to determine the enforceability of the clause, the Court did not address the propriety of including an arbitration clause in an attorney/client contract. Id., 915 P.2d at 912-913 n. 2 ("The parties do not raise, and we do not address, the propriety of an arbitration clause in an attorney fee agreement, or whether circumstances could exist that would void an arbitration clause in an attorney fee agreement.")(FN3 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#3))

This opinion will analyze the use of mandatory binding arbitration clauses in attorney/client contracts under Oklahoma Rules of Professional Conduct and Oklahoma law.(FN4 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#4))

B. Duty of Loyalty to Client; Informed Consent to Arbitration.

Arbitration can be an effective mechanism for resolving disputes between attorneys and their clients; the final comment to Rule 1.5 recommends that lawyers consider submitting to arbitration or mediation of fee disputes. However, great care must be taken to insure that mandatory arbitration clauses in attorney-client agreements comport with all relevant ethics requirements.

Loyalty is an essential element in the lawyer's relationship to a client. The lawyer's own interests should not be permitted to have adverse effect on representation of a client. Comment to Rule 1.7. The lawyer's fiduciary obligations to the client require the lawyer to exercise due care to avoid overreaching or otherwise exploiting the lawyer's superior knowledge of the legal system to the client's detriment. *See* N.Y. Cty. Law. Assn. Comm. Prof. Ethics Op. 723 (July 17, 1997). Rule 1.8(a) sets forth certain guidelines when there is, or may, be a conflict of interest between an attorney and client. While a mandatory arbitration provision does not precisely fit the language of the rule, the first comment to the rule suggests that it should be broadly construed to cover transactions in which the lawyer may have a conflicting interest with his client and has any advantage in dealing with the client. *See* D.C. Bar Ethics Op. 218 (1991); Phila. Bar Ass'n Op. 88-2 (1988).

The Rules of Professional Conduct underscore that the terms and conditions of a client's engagement of lawyer should be reasonable and based on informed consent. Rule 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." According to the comments that follow Rule 1.8, "all transactions between an attorney and client should be fair and reasonable to the client." As with any other term or condition of the relationship, a provision requiring arbitration of disputes must be reasonable and based on the consent of the client after full disclosure of the consequences of including such a provision in the agreement. In our view, such consent cannot be knowing without disclosure of the material differences between arbitration and litigation.

1. Waiver of Right to Jury Trial.

One of the primary differences is that an agreement to arbitrate amounts to a waiver of the right to a jury trial. Even outside the context of an attorney-client relationship, a waiver of the right to a jury trial may be unenforceable unless the choice to do so was knowing. *See Cole v. State,* 1977 OK CR 279, 569 P.2d 470, 472 ("It is well settled that an accused may waive his constitutional right to a trial by jury. Whether or not the accused knowingly waives that right depends, in each case, upon the particular facts and circumstances"; similarly, waiver of right to counsel requires "that the accused have full knowledge or adequate warning concerning this right and a clear intent to exercise it"); *Hayes v. State,* 1975 OK CR 193, 541 P.2d 210 (trial court should make inquiry of the accused to insure the accused's waiver is expressly and intelligently made).

The heightened duty of a lawyer to be fair in any relationship with a client increases the burden on the lawyer to make clear that a significant consequence of a binding arbitration clause is that the client will not be free to seek a jury to resolve the dispute.(FN5 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#5)) The right to a jury trial is not the only material difference between litigation and arbitration that the lawyer should disclose to the client. The comparative costs of litigation versus arbitration (including filing fees, administrative fees, and arbitrator's fees charged by some arbitration organizations, such as the American Arbitration Association) also should be discussed and fully disclosed. In many cases, arbitration may be faster and less expensive, a factor that may benefit the client in some respects. However, other differences, such as the extent of discovery rights, availability of relief, availability of appellate review on the merits, and the availability of a public forum, may be considered by the client to be less beneficial.

2. Sophistication of Client.

Outside the context of a particular attorney-client relationship, it is impossible to identify the specific facts that must be disclosed in order to make the client's agreement to an arbitration clause a fair, reasonable and knowing one. However, the sophistication of the client in such matters is a significant consideration in determining the extent of the disclosure required in the circumstances. A corporate client experienced in arbitrations or other legal proceedings may need little explanation of the consequences of an arbitration clause; an inexperienced individual may need detailed information and instruction on the costs, risks and benefits of the procedure.

In some circumstances, the extent of explanation or information that is reasonably necessary to permit an unsophisticated client to make an informed decision regarding arbitration may be analogous to the requirements for dealing with a client under a disability. See Rule 1.14. According to the Comment to Rule 1.14, "[a] normal client lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters." If a client is suffering under a disability or perhaps does not have a level of education or training that would enable the client to fully appreciate or understand the issues involved in negotiating an arbitration clause, the attorney should approach the situation cautiously with full, fair and adequate disclosure and discussion. The less sophisticated the client, the greater the duty of the lawyer to make clear in advance the import of an arbitration clause. In all circumstances, the burden is on the lawyer to provide whatever information is needed for the client fully to understand the consequences of the provision mandating arbitration of disputes.

3. Consultation with Independent Counsel

The Comment to Rule 1.8 states that in transactions between an attorney and client, "a review by independent counsel on behalf of the client is often advisable." We disagree with the opinion of several other bars that a fee agreement containing a clause mandating arbitration of fee and malpractice disputes is unethical *per se* unless the client first consults with independent counsel concerning the arrangement.(FN6 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#6)) As stated by the New York County Lawyers' Association Committee on Professional Ethics in Opinion No. 723 (July 17, 1997), "[T]o compel a client who needs a lawyer to hire another lawyer to assist in the process expresses a skepticism about the efficacy of that standard and the willingness of the bar to be faithful to it that we do not share. If anything, in our view, such a suggestion is more likely to undermine confidence in the legal profession rather than promote it." *See also* Ohio Adv. Ethics Op. 96-9 (1996) ("It is impractical to require a client to seek independent counsel before signing an engagement contract with a lawyer — the client would need to 'hire a lawyer to hire a lawyer.' It sends the wrong message to the public: Beware, the lawyer you are hiring to protect your interests may be trying to take advantage of you in the engagement contract.")

We do, however, recommend that a lawyer proposing an arbitration clause in a retainer agreement give the client an opportunity, if the client so chooses, to consult with independent counsel concerning the clause (or any other term or condition of the retainer). "Advising the client of the desirability of consulting with separate counsel is an additional safeguard of the fairness and reasonableness of the arrangement, and the client's informed consent to it." N.Y. Cty. Law. Assn. Comm. Prof. Eth. Op. 723 (1997). *See, e.g.*, N.C. Ethics Op. 107 (1991); Maryland Ethics Op. No. 94-40 (1994) (client should be advised of right to confer with other counsel with respect to any adverse consequences that might result from agreeing to mandatory arbitration, including the possible effects of res judicata or collateral estoppel.)

C. Scope of the Arbitration Clause.

The arbitration clause in an attorney-client contract should be simple and straightforward. It should clearly define the types of disputes that are subject to arbitration and clarify that, with the exception of disciplinary proceedings, there are no limitations on the types of relief that may be awarded by the arbitrators.

> 1. Fee Disputes. As noted above, the comments that follow Rule 1.5 on fees encourage the use of arbitration to resolve fee disputes: "If a procedure has been established for resolution of fee disputes, such as an arbitration or mediation procedure established by the bar, the lawyer should conscientiously consider submitting to it."(FN7 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#7))
>
> 2. Disciplinary Proceedings. According to Rule 1.1 of the Rules Governing Disciplinary Proceedings, the Oklahoma Supreme Court "possesses original and exclusive jurisdiction . . . to discipline for cause, any and all persons licensed to practice law in Oklahoma." Thus, disciplinary proceedings against the attorney cannot be the subject of an arbitration clause in an attorney-client contract.(FN8 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#8)) In other words, no agreement to arbitrate may contain a provision prohibiting the client from bringing a disciplinary complaint against the attorney.
>
> 3. Malpractice Disputes. An attorney may not include an arbitration clause in an attorney-client contract that limits an attorney's liability for malpractice. Rule 1.8(h) provides in pertinent part that "[a] lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for the lawyer's personal malpractice. . . ."

In our opinion, Rule 1.8(h) would prohibit an arbitration clause limiting the attorney's liability to the client for malpractice by putting caps, for example, on actual damages, punitive damages, costs or attorney fees.(FN9 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#9)) However, an arbitration clause that merely shifts determination of the malpractice claim to a different forum does not prospectively limit lawyer liability to the client in violation of Rule 1.8(h).(FN10

(http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#10)) To the extent that Oklahoma substantive law does not limit an arbitrator's power to award damages and other remedies, an arbitration clause in a retainer agreement applicable to all disputes other than disciplinary proceedings arising under the agreement, including malpractice claims, does not violate Rule 1.8(h).

E. Conclusion.

A lawyer may ethically include a clause in a retainer agreement requiring that all disputes except disciplinary proceedings arising under the agreement shall be subject to binding arbitration in an appropriate forum authorized to award all relief available in a court of law, provided that the lawyer fully discloses the consequences of the arbitration clause to the client and allows the client the opportunity, should the client so choose, to seek independent counsel regarding the provision.

1 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN1). For example, "an agreement to arbitrate is voidable when either the arbitration provision of the agreement or the contract containing that agreement is fraudulently induced." *Shaffer v. Jeffery*, 1996 OK 47, 915 P.2d 910, 918.

2 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN2). In *Shaffer v. Jeffrey*, the Oklahoma Supreme Court declined to follow *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402-06, 87 S.Ct. 1801, 1805-07, 18 L.Ed.2d 1270 (1967), in which the U.S. Supreme Court, interpreting the Federal Arbitration Act, held that issues relating to the making or enforcement of a contract containing an arbitration clause are to be decided by the arbitrator and not by the court.

3 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN3). As the Oklahoma Supreme Court noted in *Shaffer v. Jeffrey*, 915 P.2d at 913 n. 2, "[o]ne court has determined that in Oklahoma an arbitration clause in an attorney fee agreement could not be voided as a breach of the attorney's fiduciary duty to the client. *McGuire, Cornwell & Blakey v. Grider*, 765 F. Supp. 1048 (D. Colo. 1991)."

4 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN4). This opinion does not address the use of arbitration clauses in fee agreements that may constitute transactions involving interstate commerce (for example, a fee agreement between an Oklahoma attorney and an out-of-state client). The validity and interpretation of arbitration clauses in contracts involving interstate commerce are governed by federal law and the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*. *See, e.g., Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 838-40, 130 L.Ed.2d 753 (1995); *Hart v. Orion Ins. Co.* 453 F.2d 1358, 1361 (10th Cir. 1971); *Rollings v. Thermodyne Industries, Inc.*, 1996 OK 6, 910 P.2d at 1041-1042 (J. Opala, concurring). *See also* note 2, *supra*.

5 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN5). See Phila. Bar Ass'n Ethics Op. 88-2 (1988) (arbitration clause in fee agreement permitted if: "1. The client is advised in writing, in simple plain language, that by agreeing to arbitration the client is waiving the right to trial by jury; 2. The client is advised to seek the advice of independent counsel with regard to the waiver of a jury trial, and is given a reasonable opportunity to seek such advice; and 3. The client consents in writing"); Maryland Ethics Docket No. 94-40 (1994) (a retainer agreement may require fee disputes to be submitted to binding arbitration provided that language is included in agreement advising client that agreement to arbitrate on a mandatory basis may affect the client's legal rights, including a relinquishment of right to jury trial).

6 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN6). See Dist. Col. Ethics Op. 211 (1990); Md. Ethics Op. 90-12 (1990); Mich. Ethics Op. RI-257 (1996).

7 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN7). Arbitration of fee disputes is also encouraged on a local and national level. The Procedures and Guidelines of the Oklahoma County Bar Association Fee Grievance and Ethics Committee, which were approved by the Board of Directors of the Oklahoma County Bar Association January 28, 1993, provide for arbitration of fee disputes by a panel of the Committee. The Tulsa County Bar Association also has a Fee Arbitration Committee, which arbitrates fee disputes. In February 1995, the House of Delegates of the American Bar Association approved Model Rules for Fee Arbitration.

8 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN8). *See* Mich. Ethics. Op. RI-257 (1996) ("ethical disputes cannot be resolved by an agreement between the lawyer and client alone") Ohio Ethics Op. 96-9 (1996) (such agreements "exceed the scope of an attorney's authority, for the authority to regulate and discipline the legal professional lies within the sole authority of the Supreme Court"; "attempting to thwart the disciplinary process undermines regulation of the legal profession"); N.C. Ethics Op. 107 (1991) (all-inclusive ADR clause with a disclaimer reserving ultimate disposition of ethical issues for the respective state bar organizations is permissible).

9 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN9). *See* Op. No. 489, Los Angeles County Bar Ass'n Prof. Resp. and Ethics Comm. (1997) ("A lawyer may not include in a retainer agreement language which limits a client's right to recover punitive or non-economic damages in a malpractice action against the lawyer"). The phrase "limitation of liability" is commonly defined as including limitation of liability for certain types of damages. *See, e.g., Black's Law Dictionary* (6th Ed.) (defining "limitation of liability acts" as "[s]tate and federal statutes that limit liability for certain types of damages (e.g., pain and suffering) . . .")

10 (http://ethics.okbar.org/EthicsCounsel/EthicsOpinions/Opinion312.aspx#FN10). *See Porter & Clements v. Stone*, 935 S.W.2d 217 (Tex. App. — Houst. [1st Dist.] 1996), no writ (holding that arbitration clause in fee agreement applied to legal malpractice and misrepresentation claims, even though only examples of covered disputes expressly stated in agreement were fee-related); *McGuire, Cornwell & Blakey v. Grider*, 765 F. Supp. 1048, 1051 (D. Colo. 1991); Monahan v. Paine Webber Group, Inc., 724 F. Supp. 224, 227 (S.D.N.Y. 1989). *See also* Va. Ethics Op. 1707 (1998) (law firm may include provision in retainer agreement calling for binding arbitration of any legal malpractice complaints against its lawyers; client must be advised to seek independent counsel to evaluate the provision); N.Y. Cty. Law. Assn. Comm. Prof. Ethics Op. 723 (1997); Mich. Ethics. Op. RI 257 (1996) ("merely contracting for ADR on issues of professional malpractice does not violate MRPC 1.8(h)"); Calif. State Bar Op. 1989-116 (1989); Va. Ethics Op. 638 (1984). *But see* Ohio Bd. Com. Griev. Disp. Op. 96-9 (1996) (engagement letter between lawyer and client should

not contain language requiring client to prospectively agree to arbitrate legal malpractice disputes. Arbitration of legal malpractice dispute should be voluntary decision made by client after opportunity to consider the facts and circumstances of the dispute and to consult, if desired, with independent counsel).

# Contact Us



📞 405-416-7000
800-522-8065 (toll free)

✉ P.O. Box 53036
Oklahoma City, OK 73152

🏢 1901 N. Lincoln Blvd.
Oklahoma City, OK 73105

© 2023 Oklahoma Bar Association. All Rights Reserved.



**Attachment 6 - Opinion 586, Tex. Comm. on Professional Ethics (2008)**



| Search by Keyword or Opinion Number | **SEARCH** |

# OPINION 586

**OCTOBER 2008**

⊕ **ADD BOOKMARK**     ⬇ **DOWNLOAD PDF**

### QUESTION PRESENTED

Are binding arbitration clauses in lawyer-client engagement agreements permissible under the Texas Disciplinary Rules of Professional Conduct?

**Statement of Facts**   Discussion   Conclusion

A lawyer would like to include a binding arbitration provision in his engagement agreements with his clients. The arbitration provision would require binding arbitration of fee disputes and malpractice claims. The terms of the particular arbitration provision would not be unfair to a typical client that was willing to agree to arbitration. The lawyer would like to know if such agreements are permitted under the Texas Disciplinary Rules of Professional Conduct, and if so, what disclosures, if any, should be made to clients.

## Bluebook Citation   Copy

Tex. Comm. On Professional Ethics, Op. 586 (2008)

© 2023 Texas Center for Legal Ethics. All Rights Reserved.



Search by Keyword or Opinion Number    **SEARCH**

# Opinion 586

**OCTOBER 2008**

 **ADD BOOKMARK**    ⬇ **DOWNLOAD PDF**

**QUESTION PRESENTED**

Are binding arbitration clauses in lawyer-client engagement agreements permissible under the Texas Disciplinary Rules of Professional Conduct?

Statement of Facts    **Discussion**    Conclusion

Binding arbitration clauses have become increasingly common in lawyer fee agreements. See American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 02-425 (February 20, 2002) ("ABA Opinion 02-425"). As noted in ABA Opinion 02-425, provisions requiring arbitration of fee disputes have gained more acceptance than those involving malpractice claims. Comment 19 to Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct provides that where a "procedure has been established for resolution of fee disputes, such as an arbitration or mediation procedure established by a bar association, the lawyer should conscientiously consider submitting to it." In addition, the State Bar of Texas encourages voluntary arbitration as a preferred method of resolving fee disputes. See State Bar of Texas Fee Disputes Committee Model Rules for Fee Arbitration.

The Texas Disciplinary Rules of Professional Conduct do not specifically address agreements for arbitration of malpractice claims. The Texas Disciplinary Rules prohibit a lawyer from prospectively agreeing with a client to limit the lawyer's malpractice liability unless the agreement is permitted by law and the client is represented by independent counsel with respect to the agreement. Rule 1.08(g). Most state bar ethics committees that have considered the issue, as well as the American Bar Association Standing Committee on Ethics and Professional Responsibility in ABA Opinion 02-425, have concluded that binding arbitration provisions do not prospectively limit a lawyer's liability but instead establish a procedure for resolving such claims. See ABA Opinion 02-425 at footnote 8. ABA Opinion 02-425 concluded:

"It is ethically permissible to include in a retainer agreement with a client a provision that requires the binding arbitration of fee disputes and malpractice claims provided that (1) the client has been fully apprised of the advantages and disadvantages of arbitration and has been given sufficient information to permit her to make an informed decision about whether to agree to the inclusion of the arbitration provision in the retainer agreement, and (2) the arbitration provision does not insulate the lawyer from liability or limit the liability to which she would otherwise be exposed under common and/or statutory law."

ABA Opinion 02-425 was cited with approval by the San Antonio Court of Appeals in holding that an arbitration clause in a fee agreement did not violate Texas Disciplinary Rule 1.08(g). *In re Hartigan*, 107 S.W.3d 684, 689 (Tex. App. - San Antonio 2003, pet. denied).

The Committee agrees with this view. An arbitration clause simply shifts resolution of a dispute from a court of law to a different forum. A client's right to have the dispute resolved by a jury may be eliminated, but a lawyer does not for that reason escape liability for legal malpractice. Consequently, the Committee concludes that a lawyer's use of a malpractice arbitration clause in a fee agreement is not *per se* an attempt to limit malpractice liability in violation of Texas Disciplinary Rule 1.08(g). However, the arbitration clause must not shield the lawyer from liability to which the lawyer would otherwise be exposed. For example, an arbitration clause that prohibited the recovery of certain otherwise allowable damages for malpractice would be an impermissible limit on a lawyer's malpractice liability.

Some of the ethics opinions issued in other states that have addressed this issue have relied in part of their analysis on the equivalent of Texas Disciplinary Rule 1.08(a). Rule 1.08(a) prohibits a lawyer from entering into a business transaction with a client unless the transaction is fair and reasonable to the client, the client is given the opportunity to be represented by independent counsel, and the client consents in writing. The Committee is of the opinion that Rule 1.08(a) does not apply to a transaction establishing a lawyer-client relationship. In the Committee's

opinion, the establishment of a lawyer-client relationship is not a "business transaction with a client" within the meaning of Rule 1.08(a). Consequently, a lawyer is not required by that Rule to advise a client to seek independent counsel before agreeing to a binding arbitration clause in a fee agreement. However, the Committee notes the statement in Comment 2 to Rule 1.08 that "[a]s a general principle, all transactions between client and lawyer should be fair and reasonable to the client." Application of this principle in the case of a lawyer-client agreement for arbitration of disputes would mean that the lawyer should not attempt to include clearly unfair terms in the agreement, such as providing for the selection of the arbitrator solely by the lawyer, requiring arbitration in a remote location, or imposing excessive costs that would effectively foreclose the client's use of arbitration. In the case of an agreement for arbitration of legal malpractice claims, a lawyer's insistence on onerous provisions that effectively prevented access to the arbitration process or caused the process to be fundamentally unfair to the client would also violate Rule 1.08(g) as an impermissible prospective limitation on the lawyer's liability for malpractice.

In order for the client's agreement for arbitration to be effective, the Committee believes that the client must receive sufficient information about the differences between litigation and arbitration to permit the client to make an informed decision about whether to agree to binding arbitration. While most of the duties flowing from the lawyer-client relationship attach only after the creation of the lawyer-client relationship, some duties may attach before a lawyer-client relationship is established. See paragraph 12 of the Preamble to the Texas Disciplinary Rules of Professional Conduct. Rule 1.03(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The Committee is of the opinion that this Rule applies when a lawyer asks a prospective client to agree to binding arbitration in an engagement agreement. In order to meet the requirements of Rule 1.03(b), the lawyer should explain the significant advantages and disadvantages of binding arbitration to the extent the lawyer reasonably believes is necessary for an informed decision by the client. The scope of the explanation will depend on the sophistication, education and experience of the client. In the case of a highly sophisticated client such as a large business entity that frequently employs outside lawyers, no explanation at all may be necessary. In situations involving clients who are individuals or small businesses, the lawyer should normally advise the client of the following possible advantages and disadvantages of arbitration as compared to a judicial resolution of disputes: (1) the cost and time savings frequently found in arbitration, (2) the waiver of significant rights, such as the right to a jury trial, (3) the possible reduced level of discovery, (4) the relaxed application of the rules of evidence, and (5) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds. The lawyer should also consider the desirability of advising the client of the following additional matters,

Case 5:23-cv-00698-J Document 2 Filed 08/08/23 Page 32 of 34

which may be important to some clients: (1) the privacy of the arbitration process compared to a public trial; (2) the method for selecting arbitrators; and (3) the obligation, if any, of the client to pay some or all of the fees and costs of arbitration, if those expenses could be substantial. Although the disclosure should vary from client to client, depending on the particular circumstances, the overriding concern is that the lawyer should provide information necessary for the client to make an informed decision.

It is beyond the authority of this Committee to address questions of substantive law relating to the validity of arbitration clauses in agreements between lawyers and their clients. The Committee notes, however, that the Texas courts of appeals are split on whether a legal malpractice claim is one for "personal injury," which under the Texas Arbitration Act can be the subject of an arbitration agreement only if the client has separate representation in entering into the agreement. Compare *In re Godt*, 28 S.W.3d 732, 738 -39 (Tex. App. - Corpus Christi 2000, orig. proc.) (legal malpractice claim is a personal injury claim) with *Taylor v. Wilson*, 180 S.W.3d 627, 629-31 (Tex. App. - Houston [14th Dist.] 2005, pet. denied), *Miller v. Brewer*, 118 S.W.3d 896, 898-99 (Tex. App. – Amarillo 2003, no pet.), and *In re Hartigan*, 107 S.W.3d 684, 689-91 (Tex. App. - San Antonio 2003, pet. denied) (each holding that a legal malpractice claim is not a personal injury claim).

## Bluebook Citation   Copy

Tex. Comm. On Professional Ethics, Op. 586 (2008)

© 2023 Texas Center for Legal Ethics. All Rights Reserved.



| Search by Keyword or Opinion Number | **SEARCH** |

# OPINION 586

**OCTOBER 2008**

  ⊕ **ADD BOOKMARK**     ⬇ **DOWNLOAD PDF**

**QUESTION PRESENTED**

Are binding arbitration clauses in lawyer-client engagement agreements permissible under the Texas Disciplinary Rules of Professional Conduct?

Statement of Facts     Discussion     **Conclusion**

It is permissible under the Texas Disciplinary Rules of Professional Conduct to include in an engagement agreement with a client a provision, the terms of which would not be unfair to a typical client willing to agree to arbitration, requiring the binding arbitration of fee disputes and malpractice claims provided that (1) the client is aware of the significant advantages and disadvantages of arbitration and has sufficient information to permit the client to make an informed decision about whether to agree to the arbitration provision, and (2) the arbitration provision does not limit the lawyer's liability for malpractice.

Case 5:23-cv-00698-J   Document 2   Filed 09/08/23   Page 34 of 34

# Bluebook Citation   Copy

Tex. Comm. On Professional Ethics, Op. 586 (2008)

© 2023 Texas Center for Legal Ethics. All Rights Reserved.